38 So.3d 79 (2009)
Romaine Samples SCOTT III
v.
Catherine Grace SCOTT.
2080420.
Court of Civil Appeals of Alabama.
November 20, 2009.
*80 Wendy Brooks Crew of Crew & Howell, P.C., Birmingham, for appellant.
William P. Gray, Jr., and Douglas N. Robertson of Gray & Associates, L.L.C., Birmingham; and Daniel H. Chambers of Gorham & Cason, L.L.C., Birmingham, for appellee.
PER CURIAM.
Romaine Samples Scott III ("the former husband") appeals from a judgment of the Jefferson Circuit Court[1] ("the trial court"), which granted the former husband's petition to modify the parties' divorce judgment, in part, and found the former husband to be in contempt for willfully refusing to pay periodic alimony to Catherine Grace Scott ("the former wife") as ordered in the final divorce judgment of the parties.

Facts and Procedural History
The parties were divorced by the trial court on August 30, 2002. Pursuant to an agreement reached by the parties, which was incorporated into their divorce judgment, the former husband was obligated to pay periodic alimony to the former wife in the amount of $1,400 each month until the former husband's death, the former wife's death, the former wife's remarriage, "the [former] wife's commission of those acts contemplated in [§ ]30-2-55, [Ala.Code 1975,] or as otherwise provided by law."[2] On April 30, 2008, the former husband filed a petition to modify the parties' divorce judgment insofar as it awarded the former wife $1,400 a month in periodic alimony. The former husband alleged that there had been a material change in circumstances since the entry of the divorce judgment, asserting that the former wife's income had "increased substantially" while the former husband's income had "significantly decreased." The former husband further alleged that his obligation to pay periodic alimony to the former wife was due to be terminated because the former wife had "committed those acts contemplated in [§ ]30-2-55, [Ala.Code 1975]."
On May 15, 2008, the former wife filed an answer to the former husband's petition *81 to modify, a counterpetition to modify the parties' divorce judgment, and a petition for a rule nisi. The former wife denied the material allegations set forth in the former husband's petition and averred that her award of periodic alimony was due to be increased. She further requested, among other things not pertinent to this appeal, that the trial court hold the former husband in civil and criminal contempt for failure to pay periodic alimony pursuant to the divorce judgment.
On February 2, 2009, the former husband filed a motion for a summary judgment, arguing that there was "no genuine issue of material fact as to the cohabitation of the [former wife]." In support of his motion for a summary judgment, the former husband attached the former wife's deposition testimony and the affidavit of the parties' daughter.[3] The record indicates that the trial court did not rule on the former husband's summary-judgment motion.
The trial court heard the following pertinent evidence at an ore tenus hearing held on February 3, 2009. The former wife testified that she met a male neighbor ("the alleged paramour") in October 2003 and that they drank wine together almost every night. She further stated that they had had sexual relations and that she had spent the night at the alleged paramour's home. However, she also testified that she was not "emotionally or sexually" involved with anyone. The former wife's testimony indicated that she and the alleged paramour had traveled out-of-state together several times a year, that they had keys to one another's homes, that the alleged paramour knew the security code to the garage door at the former wife's home, and that the former wife and the alleged paramour had spent holidays together. She further testified that she and the alleged paramour shared meals together two or three nights a week.
The former wife also stated that the alleged paramour had not paid any of her bills or debts except on three isolated occasions; on those occasions, the former wife testified, she had reimbursed the alleged paramour on the same day. She stated that she had never paid any of the alleged paramour's bills. She testified that the alleged paramour had done her laundry on three occasions but that she kept no clothing or personal items at the alleged paramour's home and that the alleged paramour kept no clothing or personal items at her home. The former wife saw the alleged paramour approximately six days a week at her home, but, she stated, she had not spent the night at the alleged paramour's home since the spring of 2008. The former wife admitted that she and the alleged paramour had discussed § 30-2-55 and that she and the alleged paramour had changed some of their "habits and patterns" after she was served with the former husband's petition to modify. The former wife testified that the alleged paramour had never spent the night at her home.
The former husband stopped making periodic-alimony payments to the former wife in April 2008. The former wife stated that she used an equity line of credit to meet her monthly expenses after the former husband stopped making periodic-alimony payments. The former wife drew approximately $6,000 from the equity line of credit sometime between August 15, 2008, and September 16, 2008. The former *82 wife testified that she had used that money to pay her college-education expenses. The former wife admitted that the former husband was not obligated to pay her college-education expenses in the divorce judgment. The former wife also indicated that she drew approximately $6,000 from the equity line of credit between October 22, 2008, and November 18, 2008. The former wife testified that she used approximately $4,800 of that money to pay her credit-card bill, which, she testified, had increased since the former husband had stopped making periodic-alimony payments to her in April 2008.[4]
The former husband gave testimony setting forth his reasons for filing the petition to modify the former wife's award of periodic alimony. He testified that he had received information from the parties' daughter regarding a relationship between the former wife and the alleged paramour.[5] The former husband stated that he had met the alleged paramour at two social events when the alleged paramour was apparently escorting the former wife. Further, the former husband had learned that the former wife had gotten a job as a legal secretary and that she was earning more money than she did at the time the parties divorced. He further testified that he had begun having health problems and that he was concerned about his earning ability. The former husband stated that after he filed the petition to modify he paid the former wife's periodic-alimony payment into an escrow account held by his attorney's law firm. The former husband testified that he altered his method of paying the periodic alimony because he believed the new method was consistent with caselaw addressing the issue.[6]
The former husband testified that he had been hospitalized approximately five times in the two years preceding the final hearing in this matter. He stated that his disposable income had decreased because of his medical bills. The former husband had worked at the same law firm for approximately three years preceding the final hearing, and he testified that his income had decreased in those three years. In March 2008, the former husband's residence went into foreclosure, and at the time of the final hearing the former husband was renting a home for $900 a month.
*83 It was undisputed that the former wife's yearly income had increased by approximately $23,000 since the parties' divorce. Evidence also indicated that the former wife's monthly health-insurance cost had decreased from $203 a month to approximately $90 a month. The former wife also testified that, at the time of the divorce, she had had no retirement savings but that, at the time of the final hearing, she had approximately $15,000 saved in retirement accounts.
The former husband's income-tax documents revealed that his yearly income at the time of the parties' divorce was approximately $136,000. The former husband testified that his earned income in 2008 and 2009 was $10,000 a month, or approximately $120,000 a year. However, the former husband's 2008 tax documents indicated that his yearly income was approximately $175,000. The former husband explained that any amount he received over $120,000 was a "distribution of profits." The former husband admitted that he had received a $30,000 bonus from his employer in January 2009, but he stated that he did not receive a bonus every month.
The trial court entered a final judgment on February 4, 2009, containing the following findings and conclusions: (1) that the former wife's income had increased since the entry of the parties' divorce judgment and that, therefore, the former husband's periodic-alimony obligation to the former wife should be reduced to $950 a month; (2) that the former husband had unilaterally suspended all alimony payments to the former wife in April 2008 and had held those alimony payments in escrow; (3) that there was "no credible evidence tending to indicate that" the former wife was cohabitating with a member of the opposite sex so as to trigger the application of § 30-2-55; (4) that the former husband had brought the petition to modify in bad faith; (5) that the periodic-alimony payments made by the former husband into an escrow account were not made in good faith and caused a financial hardship to the former wife; (6) that the former husband owed the former wife $14,000, plus interest, as a periodic-alimony arrearage; (7) that the former husband was in contempt for willfully and intentionally refusing to pay periodic alimony to the former wife, as ordered in the parties' divorce judgment, from April 2008 through January 2009; (8) that the former husband should be sentenced to 50 days in jail but that that sentence would be suspended upon the payment of the periodic-alimony arrearage, plus interest, due the former wife; and (9) that, if the former husband became more than 10 days in arrears in his periodic-alimony payments at any point in the 2 years following the entry of the final order, upon the filing of a verified motion by the former wife, the trial court would conduct a "contempt hearing to determine if the conduct of the [former husband] shall merit the imposition of any remaining balance of said jail sentence."

Discussion
On appeal, the former husband first argues that the trial court erred in failing to terminate his periodic-alimony obligation to the former wife because, he asserts, there was credible evidence indicating that the former wife was cohabitating with a member of the opposite sex. This court has held that
"`[i]t is a question of fact for the trial court to determine as to whether a former spouse is living openly or cohabiting with a member of the opposite sex in order to authorize a termination of periodic alimony under § 30-2-55, Code of Alabama 1975. The burden of proof as to that matter is upon the party seeking relief under *84 the code section. The trial court's decision upon that issue will not be revised upon an appeal unless, after considering all the evidence and the reasonable inferences therefrom, the trial court was palpably wrong.'
"Knight v. Knight, 500 So.2d 1113, 1115 (Ala.Civ.App.1986). `[C]ohabitation requires some permanency of relationship coupled with more than occasional sexual activity between the cohabitants.' Hicks v. Hicks, 405 So.2d 31, 33 (Ala. Civ.App.1981); see also Vaughn v. Vaughn, 507 So.2d 960 (Ala.Civ.App. 1987). . . . To evaluate the permanency of a relationship to determine whether a former spouse is cohabiting with a member of the opposite sex, this court has considered whether the former spouse is sharing a dwelling with a member of the opposite sex; whether the former spouse has ceased to date other members of the opposite sex; payment of the former spouse's creditors by a member of the opposite sex; and the purchase of clothes for the former spouse by a member of the opposite sex. Knight v. Knight, 500 So.2d at 1115."
McNatt v. McNatt, 908 So.2d 944, 945-46 (Ala.Civ.App.2005).
Because the ore tenus rule applies to the trial court's findings, the trial court's judgment as to whether the former wife was cohabitating with a member of the opposite sex within the meaning of § 30-2-55 will be affirmed by this court "`if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.'" Id. at 945 (quoting Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala. 1992)). After a careful review of the evidence, we conclude that the trial court had evidence before it to support its finding that the former wife was not cohabitating with a member of the opposite sex.[7] The former wife's testimony revealed that she did not consider herself emotionally or sexually involved with anyone, that she and the alleged paramour maintained separate residences, and that she and the alleged paramour did not make any financial contributions to one another's creditors. See Snipes v. Snipes, 651 So.2d 19, 20 (Ala.Civ. App.1994) ("Factors suggesting permanency of relationship include occupation of the same dwelling and the sharing of household expenses."). We conclude that the trial court was not plainly or palpably wrong in implicitly finding that the former husband had not met his burden, pursuant to § 30-2-55, to establish some permanency of the relationship between the former wife and the alleged paramour or more than occasional sexual activity between the former wife and the alleged paramour. See Ex parte Ward, 782 So.2d 1285, 1287 (Ala.2000); McNatt v. McNatt, 908 So.2d at 946; and Sanders v. Burgard, 715 So.2d 808, 811 (Ala.Civ.App.1998). We therefore affirm that part of the trial court's February 4, 2009, judgment finding that the former wife was not cohabitating with a member of the opposite sex within the meaning of § 30-2-55, and we also affirm that part of the trial court's February 4, 2009, judgment requiring the former husband *85 to pay the former wife $14,000, plus interest, as a periodicalimony arrearage.
The former husband next argues that the trial court erred in holding that he was in contempt for failing to pay periodic alimony to the former wife from April 2008 through January 2009. He argues that he should not have been held in contempt because he, in good faith, relied on this court's decision in Sanders v. Burgard, supra, and paid the former wife's periodic alimony into an escrow account held by his attorney pending a determination by the trial court as to whether the former wife was cohabitating with a member of the opposite sex. In Sanders, this court stated:
"[W]e have previously interpreted § 30-2-55 to mean that the obligation to pay periodic alimony ceases on the date the spouse receiving alimony began cohabiting. [Wood v. Wood,] 682 So.2d [1386,] 1386 [(Ala.Civ.App.1996)]. Yet, the legislature specifically provided that periodic alimony paid to a cohabiting or remarried spouse does not have to be repaid. However, those who pay periodic alimony are not left without options. For instance, in this case, Sanders paid periodic alimony into an escrow account pending the trial court's final ruling. Because the court determined that Burgard was cohabiting, the periodic alimony paid into the account was returned to Sanders. In addition, this court has in previous opinions refused to require the paying spouse to pay periodic alimony arrearages that accrued during the other spouse's remarriage or cohabitation. See Tillis v. Tillis, 405 So.2d 938 (Ala. Civ.App.1981) (where husband stopped paying alimony on date of wife's remarriage, he did not have to repay alimony due between date of remarriage and date of his filing petition, because obligation ceased on date of remarriage); see also Musgrove v. Hawkins, 513 So.2d 4 (Ala.Civ.App.1987) (holding that trial court erred in ordering husband to pay wife's medical bills incurred between the date her cohabitation began and the date the petition to terminate was filed, because his obligation to pay ceased on the date the cohabitation began). Although the paying spouse will not be required to pay periodic alimony arrearages if cohabitation is proven, we do not believe that it is wise for a paying spouse to simply stop paying periodic alimony based on his or her suspicion of the other spouse's cohabitation. Such a course of action could lead to a holding of contempt, not to mention that the paying spouse could owe a considerable amount of arrearage if cohabitation was not proven. Indeed, making payments into an escrow account appears to be the better course for a person in this situation."
715 So.2d at 810-11 (emphasis added).
"A determination regarding contempt of court is committed to the sound discretion of the trial court, and we will affirm unless the trial court abused its discretion or `unless the judgment of the trial court is unsupported by the evidence so as to be plainly and palpably wrong. . . ."' Brown v. Brown, 960 So.2d 712, 716 (Ala.Civ.App. 2006) (quoting Stack v. Stack, 646 So.2d 51, 56 (Ala.Civ.App.1994)).
On appeal, the former husband argues that the evidence presented at the final hearing did not support the trial court's finding of contempt. Conversely, the former wife argues that the trial court's findings that the former husband filed the petition to modify in bad faith and that he placed the periodic-alimony payments in escrow in bad faith support the trial court's finding that the former husband "willfully and intentionally failed and refused to . . . pay alimony as ordered."
*86 However, after a review of the record, we cannot find any evidence to support the trial court's finding that the former husband filed the petition to modify in bad faith. At the final hearing, the former husband gave several reasons for filing the petition to modify, including his health condition, his knowledge that the former wife was earning substantially more income than she had been at the time of the parties' divorce, and the fact that former husband, based on information from the parties' daughter and his personal experience, suspected that the former wife had an ongoing relationship with the alleged paramour. After a review of the record, we cannot discern any evidence that the trial court could have relied on to support its finding that the former husband filed the petition to modify in bad faith.
Furthermore, this court can find no evidence to support the trial court's finding that the former husband placed the periodic-alimony payments in escrow in bad faith. The former husband testified that he altered his method of paying the periodic alimony because he believed the new method was consistent with caselaw addressing the issue.[8] As set forth above, this court in Sanders clearly endorsed the payment of periodic alimony into an escrow account upon the filing of a petition to modify an award of periodic alimony pursuant to § 30-2-55 in order to avoid the possibility of a contempt finding.
We conclude that the trial court exceeded its discretion in holding the former husband in contempt because there was no evidence to support the trial court's finding that the former husband "willfully and intentionally failed and refused to . . . pay [periodic] alimony as ordered." Instead, the evidence at the final hearing indicated that the former husband, following the clear direction given by this court in Sanders, began making periodic-alimony payments into an escrow account after filing a petition to modify the former wife's award of periodic alimony based, in part, on the former husband's good-faith belief that the former wife was committing the acts contemplated in § 30-2-55. Therefore, that part of the trial court's February 4, 2009, judgment holding order finding the former husband in contempt is reversed. On remand, the trial court is ordered to vacate that portion of its February 4, 2009, judgment holding the former husband in contempt.
However, we cannot endorse the former husband's unilateral decision to place his monthly periodic-alimony payments into escrow. Such action has the potential to cause a financial hardship on a spouse receiving alimony. When a payor spouse files a petition to modify an award of periodic alimony based on § 30-2-55, we believe the better procedure is for the payor spouse to file a motion, in conjunction with or subsequent to filing the petition to modify, requesting that the trial court conduct *87 an expedited pendente lite hearing to determine whether the payor spouse may place periodic-alimony payments into escrow.
Finally, the former husband argues that the trial court exceeded its discretion by failing to terminate his periodic-alimony obligation to the former wife based on the change in both parties' financial circumstances.
"`It is well established in Alabama that the modification of an alimony provision based upon changed circumstances is a matter that rests within the circuit court's sound discretion. Furthermore, the ore tenus standard is applied to the ruling of the circuit court; thus, a presumption of correctness attaches to the ruling and the ruling will not be reversed unless it is not supported by the evidence and is clearly an abuse of the court's discretion.. . .'"
Ex parte Millard, 683 So.2d 1002, 1003 (Ala.1996) (quoting Ex parte Smith, 673 So.2d 420, 421 (Ala.1995)).
"`Thus, when [the Supreme] Court or the Court of Civil Appeals reviews a circuit court's order, it is not to substitute its judgment of the facts for that of the circuit court. Rea v. Rea, 599 So.2d 1206 (Ala.Civ.App.1992). Instead, [the appellate court's] task is simply to determine if there was sufficient evidence before the circuit court to support its decision against a charge of arbitrariness and abuse of discretion. Peterman v. Peterman, 510 So.2d 822 (Ala.Civ.App.1987).'"
Id. (quoting Ex parte Smith, 673 So.2d at 422).
We conclude that evidence presented to the trial court supports the trial court's judgment modifying the former wife's award of periodic alimony. The former husband presented evidence indicating that the former wife was earning approximately $23,000 a year more than she had been earning at the time of the parties' divorce. However, the former wife also produced evidence indicating that the former husband earned approximately $39,000 more in 2008 than he had at the time of the parties' divorce. The trial court could have concluded that that testimony, along with the testimony of the former husband regarding his medical condition, supported a downward modification of the former husband's periodic-alimony obligation to the former wife.
The former husband argues that the former wife is "financially self-supporting and does not need alimony to sustain a lifestyle that is at least equal or better than that which existed during the marriage." The trial court heard ore tenus evidence regarding the former wife's income, expenses, and lifestyle, as well as evidence indicating that the former wife had been required to draw on an equity line of credit in order to pay her credit-card bill after the former husband stopped making periodic-alimony payments to her in April 2008. The trial court specifically found that the former wife had suffered a financial hardship when the former husband stopped making periodic-alimony payments directly to the former wife in April 2008. To reverse the trial court's judgment because we believe that the former wife was financially self-supporting or that she maintained a lifestyle status equal to or better than the status the parties had enjoyed during marriage would be to substitute our judgment for the trial court's, and that we will not do. See Ex parte Foley, 864 So.2d 1094, 1099 (Ala.2003) (holding that "an appellate court may not substitute its judgment for that of the trial court" and that "[t]o do so would be to reweigh the evidence, which Alabama law does not allow"). Therefore, we affirm the *88 trial court's judgment insofar as it modified the former husband periodic-alimony obligation to the former wife.
The former wife's request for attorney's fees is denied.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs in part and dissents in part as to the rationale and concurs in the result, with writing.
THOMAS, J., concurs in part and dissents in part, with writing.
MOORE, Judge, concurring in part and dissenting in part as to the rationale and concurring in the result.
I concur in that part of the main opinion affirming that portion of the judgment refusing to terminate the periodic-alimony obligation of Romaine Samples Scott III ("the former husband") on the basis of the alleged cohabitation of Catherine Grace Scott ("the former wife") with a person of the opposite sex. The facts of this case mirror almost exactly the facts in Rutland v. Rutland, 494 So.2d 662 (Ala.Civ.App. 1986), another case in which this court affirmed a trial court's judgment based on its factual determination that a spouse who was receiving alimony was not cohabiting with her social and romantic companion.
In his brief to this court, the former husband argues that he presented sufficient evidence to support a finding of cohabitation. Indeed, some aspects of the testimony of the former wife alone would have justified a finding that the former wife had at least, at one point in time, cohabited with a member of the opposite sex. However, under the ore tenus rule applicable to this case, our review is restricted to a determination of whether the trial court's factual findings are supported by credible evidence. McNatt v. McNatt, 908 So.2d 944, 945 (Ala.Civ.App.2005). That standard of review does not permit this court to reverse the trial court's judgment based on a particular factual finding on the ground that sufficient, or even arguably more substantial, evidence supports a contrary factual finding. See Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004). Hence, I find the former husband's argument unavailing, and I agree with the main opinion that the trial court did not commit reversible error by failing to find that the former wife had been cohabiting with a person of the opposite sex.
I also concur in that part of the main opinion reversing that portion of the judgment holding the former husband in contempt. Although, on February 10, 2009, the former husband purged himself of contempt by paying the former wife the alimony he had paid into escrow, together with interest, his appeal as to this issue is not moot. See Gilbert v. Nicholson, 845 So.2d 785 (Ala.2002) (appellant's purging of contempt by payment of past-due child support did not moot appeal); see also Ex parte Parmer, 373 So.2d 845 (Ala.1979).
Substantively, I agree with the main opinion that the record contains no credible evidence supporting the trial court's factual determination that the former husband alleged the cohabitation of the former wife in bad faith.[9] At trial, the former *89 wife bore the burden of proving that the former husband had committed contempt of court. In her brief to this court, the former wife argues that she carried her burden by proving that the former husband alleged cohabitation based exclusively on hearsay, specifically, the out-of-court statements of the parties' daughter. I cannot agree that the former husband relied on only hearsay to form his belief that the former wife was cohabiting. The former husband testified that, in addition to statements he received from the parties' daughter, he had also suspected that the former wife was cohabiting based on his personal observations of the former wife and her alleged paramour at family events. Nevertheless, even if the former husband had based his allegation exclusively on the daughter's statements, such reliance does not constitute bad faith. In many civil cases, at the time of the filing of a pleading, a party may have no access to firsthand information or other admissible evidence to prove his or her allegations, but that certainly does not mean that those allegations have no substantial justification or that the allegations are interposed for vexatious purposes. See Ala.Code 1975, § 12-19-271(1) (defining "without substantial justification" as that term is used in the Alabama Litigation Accountability Act, Ala.Code 1975, § 12-19-270 et seq.). In this particular case, for example, the hearsay statements turned out to be reliable because, in her testimony at trial, the former wife actually confirmed many of the statements contained in the affidavit of the daughter that, as elaborated above, would have supported a finding of cohabitation. Because there appears to be no other basis for its finding, the trial court obviously erred in concluding that the former husband had alleged cohabitation in bad faith.
The trial court likewise erred in finding that the former husband had paid alimony into escrow in bad faith. The undisputed testimony shows that the former husband relied on a statement contained in Sanders v. Burgard, 715 So.2d 808, 811 (Ala.Civ. App.1998), when, without first receiving permission from the trial court, he ceased making alimony payments to the former wife and, instead, made those payments into an escrow account pending the outcome of the parties' litigation. The parties dispute whether the statement from Sanders that the former husband relied on is dictum, but, even if it is, I find that it is sufficiently authoritative to remove any implication that the former husband was acting willfully and contumaciously when he followed its direction. See Rule 70A(a)(2)(D), Ala. R. Civ. P. (defining "civil contempt" as the "willful, continuing failure or refusal of any person to comply with a court's lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with").
Although the main opinion's conclusion that the trial court committed reversible error in finding the former husband in contempt completely resolves that issue, the majority today modifies the directive in Sanders by creating a new procedure requiring a payor spouse to file a motion and to receive the approval of the court before paying alimony into escrow. I do not believe that procedure solves the dilemma at hand. Section 30-2-55, Ala. Code 1975, provides:
"Any decree of divorce providing for periodic payments of alimony shall be modified by the court to provide for the termination of such alimony upon petition of a party to the decree and proof that the spouse receiving such alimony *90 has remarried or that such spouse is living openly or cohabiting with a member of the opposite sex. This provision shall be applicable to any person granted a decree of divorce either prior to April 28, 1978, or thereafter; provided, however, that no payments of alimony already received shall have to be reimbursed."
(Emphasis added.) Both Sanders, 715 So.2d at 810, and Ex parte Ward, 782 So.2d 1285, 1288 (Ala.2000), state that the last line of § 30-2-55 prohibits reimbursement of payments of alimony made to a cohabiting spouse. Thus, should a trial court exercise its discretion by denying a motion to escrow alimony payments pendente lite, only to later determine that the receiving spouse had been cohabiting with a member of the opposite sex within the meaning of § 30-2-55, the trial court would be powerless to order the receiving spouse to return the funds. On the other hand, should the trial court exercise its discretion by granting the motion, only to later determine that the receiving spouse had not been cohabiting, the release of the escrow funds, even with interest, may in many cases prove an inadequate remedy to a receiving spouse who has undergone financial hardship in the interim.
In my opinion, the better solution, and one which would protect all the parties, would be to hold that § 30-2-55, in fact, does not prevent reimbursement of alimony payments made to a receiving spouse judicially determined to have cohabited with a member of the opposite sex. That construction would allow an allegedly cohabiting spouse to continue to receive alimony without it being placed in escrow. If the trial court determines that the receiving spouse has been cohabiting, the trial court may protect the payor spouse by ordering the receiving spouse to reimburse the periodic-alimony payments made during the period of cohabitation. If the trial court determines that the receiving spouse has not been cohabiting, the parties would remain in status quo, sparing the receiving spouse from any financial hardship.
I believe ordinary rules of punctuation would support the foregoing construction. The first clause in the last sentence of § 30-2-55 is separated from the second clause by a semicolon. In discussing the use of a semicolon in another statute, our supreme court stated:
"One of the common uses of a semicolon is to separate independent clauses closely connected in meaning. See J. McCrimmon, Writing With A Purpose, 409-10 (5th ed.1974); F. Crews, The Random House Handbook, 341 (2d ed.1977). `A semicolon is . . . employed to separate independent elements, especially when they are related and not joined by a conjunction.' The American Heritage Dictionary of the English Language (American Heritage Publishing Co. 1969). It is, therefore, logical to assume that the legislature used a semicolon, rather than a period, to separate the third clause from the first and second clauses of the third sentence because the subject matter of the third clause is closely related to the subject matter of the two preceding clauses."
Saxon v. Lloyd's of London, 646 So.2d 631, 634-35 (Ala.1994). Following that logic, the second clause of the last sentence of § 30-2-55 bears a close relation to the first clause of that same sentence. The legislature obviously intended that § 30-2-55 would apply to divorce judgments entered on or after April 28, 1978, and that payments of alimony received before that date would not be reimbursable. The legislature did not intend, as the courts stated in Sanders and Ward, that alimony payments made to cohabiting former spouses would never be reimbursable after April 28, 1978.
*91 Of course, this court has the power to overrule Sanders because it is one of our own opinions. However, this court has no power to overrule decisions of the Supreme Court of Alabama. C & S Constr. Co. v. Martin, 420 So.2d 788, 789 (Ala.Civ. App.1982). Based on my review of the statement in Ward, however, I am not convinced that our supreme court actually decided that the last line of § 30-2-55 prevents a refund for any periodic alimony a payor spouse has already paid after cohabitation begins. That issue was not even before the court in Wardnothing in the facts indicates that the payor spouse was even seeking a refund of alimony payments made to the cohabiting receiving spouse. Hence, the statement in Ward appears to be dictum, which, though persuasive, is not binding on this court. See Ex parte M.D.C., [Ms. 1071625, Sept. 30, 2009] ___ So.3d ___, ___ (Ala.2009). By overruling Sanders, and by contradicting the dicta in Ward, I do not believe we would exceed our authority. However, as I am in the minority on that point, I can only respectfully dissent and urge the supreme court to reconsider its position.
Finally, I concur in the result as to the affirmance of that portion of the judgment reducing, but not terminating, the former husband's alimony obligation. Although I agree with the former husband that the evidence shows without dispute that the former wife is now self-supporting without the alimony, see Peterman v. Peterman, 510 So.2d 822, 823 (Ala.Civ.App.1987) (holding that a former spouse is self-supporting when his or her total income equals or exceeds his or her expenses), the former husband cites no authority that requires a trial court to terminate alimony based on a finding that the receiving spouse is currently self-supporting. See Rule 28, Ala. R.App. P. In fact, our caselaw indicates that a trial court retains the discretion to maintain alimony even when the receiving spouse has become self-supporting. See Peterman, 510 So.2d at 823 ("We hasten to point out that even where a recipient of periodic alimony is determined to be self-supporting, such fact would merely authorize a trial court to terminate or modify periodic alimony in its discretionary power, yet such would not necessarily mandate the court to do so."); see also Jones v. Jones, 251 Ala. 179, 181, 36 So.2d 310, 312 (1948) (return to employment by former wife and her ability to thereafter "make both ends meet" did not mandate reduction or termination of alimony). By relying solely on the argument that the trial court was required to terminate his periodic-alimony obligation based upon the evidence that the former wife is self-supporting, the former husband has utterly failed to show that the trial court exceeded its discretion.
THOMAS, Judge, concurring in part and dissenting in part.
Although I concur in all other aspects of the main opinion, I must respectfully dissent from that portion of the opinion affirming the trial court's denial of the former husband's petition to terminate alimony, which was based, in part, on the former husband's assertion that the former wife had been cohabitating with a member of the opposite sex. The former wife, who is a legal secretary, testified that she had consulted both Ala.Code 1975, § 30-2-55, and some of the caselaw addressing that code section when she was served with the former husband's petition to terminate alimony. She also admitted that she and her alleged paramour had changed aspects of their behavior after she was served with the former husband's petition to terminate alimony.
The former wife's testimony at trial was, at best, inconsistent. When asked whether she was emotionally and sexually involved *92 with the alleged paramour, the former wife responded "yes and no" and said that she was not "emotionally and sexually involved with anyone." She later testified that she was "emotionally involved" with her alleged paramour. She also admitted being "emotionally attached" to her alleged paramour and admitted having had a sexual relationship with him in the past.
Although they did not share expenses or live in the same dwelling, see Taylor v. Taylor, 550 So.2d 996, 997 (Ala.Civ.App. 1989) (indicating that those factors suggest some permanency of relationship), the former wife and the alleged paramour saw each other five to six days a week, went on trips together to visit family members both in and outside Alabama, regularly spent holidays with each other's families, and ate meals together at least three nights per week from October 2003 until the spring of 2008. On their trips together, the former wife and the alleged paramour shared expenses at times; the former wife testified that she sometimes paid for the alleged paramour's meals and that he sometimes paid for hers. The former wife further testified that, on some trips, the alleged paramour paid for their lodging reservations on his credit card. The former wife and the alleged paramour have keys to each other's residences, and the former wife said at trial that the alleged paramour knew the alarm code to her home, as well. When the alleged paramour twice had knee surgery, the former wife stayed the night in the hospital room with him; both the alleged paramour and the former wife had driven the other to and from the hospital for outpatient procedures. The alleged paramour is listed as the former wife's emergency contact.
As mentioned in the main opinion, the former wife admitted that she and the alleged paramour drank wine together almost every night. She also admitted to eating meals with the alleged paramour regularly. She further admitted that she and the alleged paramour had spent the night together in the past, although she indicated that they never spent the night together at her home. And, yet, when asked whether her daughter had been present in June 2004 when the former wife and the alleged paramour had eaten a meal together and then retired to the alleged paramour's home for the night, the former wife's answer was evasive and nonresponsive to the question; she answered "if that happened, yes, she could have."
As noted above, the former wife admitted to consulting both statutory law and caselaw regarding cohabitation and alimony. She said that she and her alleged paramour had discussed the issue of her alimony and that they had discussed what things she and he could and could not do, based on the law regarding the termination of alimony. The only testimony specifically indicating what changes the former wife and the alleged paramour made to their relationship after she was served with the petition to terminate alimony was the former wife's admission that she had showered at the alleged paramour's house at times before the petition to terminate alimony was filed, but not after. The former wife testified that she had ended her sexual relationship with the alleged paramour sometime in the spring of 2008; she was served with the former husband's petition to terminate alimony in May 2008. In my opinion, the former wife admitted that the petition to terminate alimony compelled her and her alleged paramour to change the character of their relationship out of fear that her alimony would be terminated.
Thus, I would conclude that the former wife's testimony is an admission that her relationship with her alleged paramour, before the changes in behavior they admittedly *93 made, amounted to cohabitation under § 30-2-55. Coupled with the other evidence indicating that the former wife and her alleged paramour had had some permanency of relationship and had engaged in more than occasional sexual activity, see Ex parte Ward, 782 So.2d 1285, 1287 (Ala.2000), I believe the former wife's admission that she changed her behavior in response to the former husband's petition should compel a conclusion that the former wife was cohabiting with her alleged paramour at the time the former husband sought to have his alimony obligation terminated. I would, therefore, reverse the trial court's judgment insofar as it declined to terminate the former husband's alimony obligation based on the fact that the former wife was cohabiting with a member of the opposite sex.
NOTES
[1] All the judges serving in the domestic-relations division of the Jefferson Circuit Court recused themselves from this case. The case was therefore assigned to a judge from the Marshall District Court.
[2] Section 30-2-55 provides, in pertinent part:

"Any decree of divorce providing for periodic payments of alimony shall be modified by the court to provide for the termination of such alimony upon petition of a party to the decree and proof that the spouse receiving such alimony has remarried or that such spouse is living openly or cohabiting with a member of the opposite sex.... [N]o payments of alimony already received shall have to be reimbursed."
[3] According to her sworn affidavit, the parties' daughter lived with the former wife from August 2003 through March 2006, and again from March 2007 through August 2007, and she had personal knowledge of certain aspects of a relationship between the former wife and the former wife's neighbor.
[4] A review of a statement of the former wife's credit-card use reveals that the former wife paid $4,506.25 toward her accumulated credit-card debt in October 2008, which was the total balance of her credit card. In April 2008, the balance on the former wife's credit card was $589.60.
[5] The former husband attached the affidavit of the parties' daughter to the motion for a summary judgment he filed the day before the final hearing in this matter. However, the parties' daughter did not testify at the final hearing. The trial court heard the former husband's testimony regarding the statements made by the parties' daughter in her affidavit, not for the truth of the matter asserted, but only to establish the former husband's motive for filing the petition to modify. See Queen v. Belcher, 888 So.2d 472, 477 (Ala.2003) (noting that statements in affidavits are generally considered to be inadmissible hearsay that cannot be offered as substantive evidence at trial).

The former husband's brief on appeal contains a statement of facts that includes certain facts found only in the former wife's deposition testimony and a factual summary of the statements in the parties' daughter's affidavit. The former wife asks this court to strike those portions of the former husband's brief that incorporate facts not contained in the trial record, i.e., facts derived from the former wife's deposition testimony and the parties' daughter's affidavit. We deny the motion to strike; however, this court has considered only the evidence properly offered to and received by the trial court. See Thompson v. Patton, 6 So.3d 1129, 1138 (Ala.2008).
[6] The former husband is a practicing attorney in Jefferson County.
[7] The former husband asks this court to "consider whether to allow recipients of alimony to enter into relationships that fall well within the spirit of cohabitation but allow them to retain alimony because they, through last minute manipulation, seek to make the relationship appear to be less permanent than it is." We believe that it is well within the sound discretion of the trial court to consider such a scenario in making its judgment. Although this court is disturbed by the former wife's admission that she and the alleged paramour adjusted some of their behavior after she received the former husband's petition to modify the parties' divorce judgment, we must assume that the trial court heard that testimony and fully considered it when making its final determination.
[8] The former wife argues that the former husband did not produce any evidence at trial to substantiate his claim that he began paying alimony into escrow after filing the petition to modify, especially in light of the fact that the former husband filed motions pro se for two months following the filing of his petition to modify and escrow account was purportedly held by his attorney's law firm. However, the former wife never challenged the former husband's failure to produce evidence to show when he first began making the periodic-alimony payments into escrow. In fact, there is very little testimony in the record regarding the escrow of the periodic-alimony payments from April 2008 through January 2009. The former husband testified that the $1,400 a month that was due the former wife was paid into an escrow account held by his attorney's law firm. Further, in its final order, the trial court found that the former husband "ha[d] held the [periodic] alimony payments in escrow."
[9] The main opinion states that "we cannot find any evidence to support the trial court's finding that the former husband filed the petition to modify in bad faith." 38 So.3d at 86. Actually, the trial court did not find that the former husband filed the entire petition to modify in bad faith. It found only that the former husband had alleged cohabitation in bad faith. Hence, I believe the main opinion is overly broad in addressing the good faith of the former husband in alleging that alimony should be modified based on the changed financial circumstances of the parties.